**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| EUGENE MARTINEZ, DAVID SILVA, MARIO OLIVAREZ, RUBY MARTINEZ, and SYLVIA TREVINO, | § § § § | |
| *Plaintiffs,* | § § | Civil Action No.  SA-16-CV-870-XR |
| v. | § § | |
| SUPERIOR HEALTHPLAN, INC. and CENTENE CORPORATION, | § § § | |
| *Defendants.* | § | |

**ORDER**

On this date, the Court considered the Motions for Summary Judgment filed by Defendants Superior HealthPlan, Inc. and Centene Corporation (docket nos. 72 & 73). Plaintiffs sold Medicare Advantage plans for Superior HealthPlan, Inc. and allege that they were mis-classified as independent contractors when they were in fact employees. They assert claims under the Fair Labor Standards Act ("FLSA") for failure to pay required overtime wages. Defendants contend that Plaintiffs were independent contractors, but even if they were employees, they were exempt outside sales employees. Assuming that Plaintiffs were employees rather than independent contractors, which the Court does not decide, the Court finds that Plaintiffs were exempt under the "outside sales employees" exemption.

**Background**

Plaintiffs are individuals who worked as sales representatives for Superior HealthPlan, Inc. ("Superior"). Centene Corporation is a holding company with multiple subsidiaries, including Defendant Superior and non-party Centene Management Company, LLC.

Plaintiffs filed their Original Complaint against Defendants Superior HealthPlan, Inc. and Centene Corporation on August 31, 2016, alleging violations of the FLSA for failure to pay required overtime wages.   Defendants filed a motion to dismiss under Rule 12(b)(6) or, alternatively, for a more definite statement.  After a hearing, the Court issued an oral order granting in part and denying in part, and Plaintiffs then filed a First Amended Complaint.

The First Amended Original Complaint alleged that Plaintiffs entered into an Employed Sales Rep and Exclusive Independent Sales Agent Agreement with Superior and that their job duties included, but were not limited to, soliciting Medicare Advantage Plans to the public on behalf of Superior and Centene.   Plaintiffs alleged that Superior and Centene exercised substantial control over Plaintiffs' job duties and responsibilities.  Plaintiffs further alleged that although they executed written agreements with Superior, Centene also maintained an employer relationship with them as evidenced by payroll and IRS records.

Plaintiffs alleged that their jobs "often required that they talk to and meet with customers during and after the regular work day" and "frequently worked numerous hours well in excess of forty (40) hours per week."  Plaintiffs alleged that they were *de facto* employees entitled to the protections afforded by the FLSA.  They further alleged that because they were misclassified as independent contractors, they were denied employee benefits such as pension, retirement, profit-sharing, and insurance.  Thus, they alleged that Defendants intentionally and willfully deprived them of the opportunity to participate in these benefits under ERISA.  Last, Plaintiffs assert a violation of the Consolidated Omnibus Budget Reconciliation Act ("COBRA") based on their failure to be informed of and failure to obtain COBRA benefits.

Defendants filed a motion to dismiss the amended complaint. The Court mostly denied the motion to dismiss, but did find that Plaintiffs needed to plead more specific facts

demonstrating individual or enterprise coverage. Plaintiffs then filed a Second Amended Complaint (docket no. 37), which remains the live pleading. It asserts claims under the FLSA, ERISA, and COBRA. Defendant Superior filed counterclaims against David Silva and Eugene Martinez for money had and received based on mistaken overpayment of commissions.

The Court granted Defendants' motion to dismiss and dismissed Plaintiffs' ERISA and COBRA claims on the basis that, even assuming they were employees, they did not meet eligibility requirements. Docket no. 49. The Court denied Plaintiffs' motion to dismiss Defendants' counterclaims. *Id.* Thus, Plaintiffs' FLSA claims and Superior's counterclaims remain pending.

Defendants now move for summary judgment on Plaintiffs' FLSA claims.  Defendant Superior asserts that all Plaintiffs were independent contractors or, in the alternative, were outside salespersons exempt from FLSA overtime coverage. Superior further asserts that there is no cause of action for FLSA record-keeping violations, and that Ruby Martinez and Sylvia Trevino's FLSA claims must be dismissed under the statute of limitations. Defendant Centene adopts Superior's arguments and additionally moves for summary judgment on the basis that it was not Plaintiffs' employer. Plaintiffs responded in opposition. Because Plaintiffs' response failed to meaningfully respond to Defendants' assertion that Plaintiffs were exempt outside salespersons, Defendants focused their reply on application of the exemption, asking the Court to rule that the exemption applies.

## Facts

The Court will assume without deciding for purposes of this motion  that Plaintiffs were employees rather than independent contractors, and limits its analysis to the issue of whether

Plaintiffs were exempt outside salespersons. That issue requires the Court to determine whether Plaintiffs' primary duty was making sales and whether they were customarily and regularly engaged away from the employer's places of business. For purposes of the analysis, the Court will further presume that both Superior and Centene were Plaintiffs' employers, but does not decide the issue.

Plaintiffs each entered into independent sales agreements with Superior on November 30, 2012. Each contract was called "Employed Sales Rep and Exclusive Independent Sales Agent Agreement" and was entered into between the individual Plaintiff and Superior "for the purpose of setting forth the terms and conditions under which Sales Rep/Independent Agent shall provide certain services to Superior for the solicitation of Medicare Advantage Plans." Superior is authorized by the Department of Health and Human Services to offer Medicare Advantage Plans.[1]

Each Sales Rep/Independent Agent may solicit enrollment of Enrolling Persons in a "defined service area" under the Agreement, which is "limited to the jurisdiction(s) in which Superior is licensed to operate as a Medicare Advantage Organization." "Sales Rep/Independent Agent" is defined as the signing agent who (1) is duly licensed pursuant to the jurisdiction in which such Sales Rep/Independent Agent intends to solicit Enrolling Persons, (2) is approved and appointed by Superior to solicit enrollment of Enrolling Persons under the Agreement; and

---

[1] Plaintiffs sold Superior's zero-premium Medicare Advantage plan (known as Star+Plus among other names), primarily to senior citizens in the vicinity of Bexar County and Nueces County. Superior does not receive revenues from enrollees, but does receive per-enrollee capitation payments from the federal government regardless of how much medical treatment enrollees actually receive. Because Superior received larger capitation payments as more persons enrolled, much of Plaintiffs' compensation was derived from how successful they were in sales – the more customers they sold the plan to, the more money they received.

(3) has executed the Independent Sales Agent Agreement with Superior to solicit enrollment of Enrolling Persons under the Agreement.

Under the Agreement, each sales agent was responsible for complying with continuing education requirements for maintaining licensure and was to pay for licenses, fees, or taxes for licensing, except Superior would pay the appointment fees for those holding a Texas Resident Agent license. Agrmt. ¶ 2.1. The Agreement contains a section entitled "Limitation on Authority," which provides that sales agents shall not, among other things, (1) bind coverage, (2) accept an applicant, (3) misrepresent or omit important facts in any application, (4) receive any money for Superior, (5) solicit in any area of the state in which Superior is not authorized to market Medicare Advantage Plans, (6) extend credit or incur any liability or obligation on behalf of Superior, (7) modify or waive any Medicare Advantage Plan provisions or any terms regarding enrollment, coverage, or benefits, (8) distribute any advertising, circular, or promotional literature without prior approval by Superior, except such materials provided to the agent by superior, or (9) represent that the agent has authority on behalf of Superior or has any authority except as explicitly provided by the agreement. Agrmt. ¶ 2.2.

With regard to training, the Agreement provides that the sales agent "shall complete Superior's initial and ongoing training to assure Sales Rep/Independent Agent's compliance with Superior's marketing and enrollment policies," including "routine evaluation of Sales Rep/Independent Agent's performance under this Agreement." Agents "must pass the annual compliance and plan proficiency test with a minimum score of 85%." Agrmt. ¶ 2.3.

Under a section entitled "Solicitation," the Agreement provides that sales agents "shall use best efforts to solicit enrollment of Enrolling Persons under the terms of this Agreement."

The agents "shall submit to a prospective Enrolling Persons proposal letters in a form and upon such terms as are approved in advance by Superior" and no terms may be altered without prior written approval by Superior. Further, "Sales Rep/Independent Agent shall accurately and fully record information required by Superior for the enrollment of Enrolling Persons under a Medicare Advantage Plan and shall comply with applicable policies and procedures as established by Superior from time to time." Agrmt ¶ 2.4. Only Superior could accept or reject a prospective Enrolling Person submitted for enrollment by a Sales Rep/Independent Agent. Agrmt. ¶ 2.5. The Sales Rep would deliver and explain initial administrative forms such as enrollment materials and renewal forms (approved in advance by Superior) and would ensure the Enrolling Persons sign and return forms to Superior in a timely manner. Agrmt. ¶ 2.6.

During the term of the Agreement, "Sales Rep/Independent Agent's business relationship with Superior shall be 'exclusive' as follows: Sales Rep/Independent Agent shall market and solicit the enrollment of Enrolling Persons, as that term is defined in this Agreement, in the Defined Service Area(s), only for Superior and not for any other insurance company, preferred provider plan, health maintenance organization, or any other entity licensed and under contract with CMS [Centers for Medicare and Medicaid Services] to sell Medicare Advantage plans." Agrmt. ¶ 2.7. Agents could obtain marketing and enrollment materials necessary for solicitation from Superior, and shall return them upon termination of the Agreement. Agrmt. ¶ 2.8. Agents were required to maintain their own general liability, professional liability, and employee dishonesty insurance policies. Agrmt. ¶ 4.1.

The Agreement was to continue until terminated under ¶ 5.2, which allowed either party to terminate upon thirty days prior written notice or upon certain conditions such as violations

of the exclusivity provisions, failure to maintain insurance coverage, failure to meet performance and production standards set forth in the Appendix, and failure to maintain appropriate licensing. The Agreement states that, for tax purposes, agents are considered self-employed and Superior did not withhold taxes or social security. Agrmt. ¶ 3.2. It further provides in the miscellaneous provisions that "[t]he relationship between Superior and Sales Rep/Independent Agent is solely that of independent contractors and nothing in this Agreement or otherwise shall be deemed or construed to create any other relationship, including one of employment, joint venture, or agency." Agrmt. ¶ 7.1.

Sales Reps were paid pursuant to an Agent Compensation Policy attached as an Appendix to the Agreement. It provides that Sales Reps will be paid $1,500 bi-weekly and "Superior shall also reimburse Sales Rep/Independent Agent an additional $60 per month to be applied to the premium charges for the Sales Rep/Independent Agent's errors and omissions insurance coverage that is in place and effective during the term of this agreement upon presentation to Superior of appropriate receipts indicating premium payments made." Commissions were paid monthly at $125 per CMS-approved application, with 100% chargeback for disenrollment within the first three months. Bonuses were also paid based on exceeding sales goals, which were set at 25 for San Antonio/Bexar County. There was also a 2013 compensation guarantee that compensation would be no less in total than that received in 2012.

Non-party Centene Management Company LLC issued Plaintiffs' payroll checks and Form 1099s. *E.g.*, Docket no. 81-4; docket no. 81-5. Appendix A to the Agreements also included certain Articles concerning the "Medicare Sales Commission Plan (MSCP)," including

that the compensation plan was "subject to approval and discretionary amounts can be added by Centene management." Further, "Centene management has the authority to make plan changes and/or terminate the MSCP at any time." The compensation plan was effective November 1, 2012 and would automatically renew annually unless terminated or amended by management. Appendix B to the Agreement contained a "Code of Ethics" to which Sales Reps were expected to adhere. Appendix C was a HIPAA Business Associate Agreement

## Analysis

An employee who brings a FLSA action for unpaid minimum wages or overtime compensation must demonstrate, by a preponderance of the evidence, that there existed an employer-employee relationship during the periods claimed. *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014). By their motions, Defendants seek summary judgment on this issue, asserting that Plaintiffs were independent contractors rather than employees. However, Defendants further contend that, even if Plaintiffs were employees and otherwise established an FLSA claim, they were exempt under the FLSA's outside sales employee exemption. As noted, Defendants' reply focuses on the application of the exemption. Because the Court finds that summary judgment is warranted on the outside sales employee exemption, the Court will presume for purposes of analysis that Plaintiffs were employees of Superior and Centene, but does not decide the issue.

An employer bears the burden of proving that an employee is ineligible for overtime or minimum-wage compensation. *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 580-81 (5th Cir. 2013). The employer must prove facts by a preponderance of the evidence that show the exemption is "plainly and unmistakably" applicable. *Id.* FLSA exemptions are to be given a

fair (rather than a narrow) interpretation. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

The FLSA exempts certain employees from its minimum wage and overtime requirements, including workers "employed . . . in the capacity of outside salesm[e]n (as such term[ is] defined and delimited from time to time by the regulations of the Secretary . . .)." 29 U.S.C. § 213(a)(1); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012). The Fifth Circuit has not considered this exemption in many opinions, but has noted that the logic of the exemption is that "[s]uch [a] salesman, to a great extent, works individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates." *Meza v. Intelligent Mexican Marketing, Inc.*, 720 F.3d 577, 581 (5th Cir. 2013) (quoting *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir.1941)). An outside salesman typically earns a salary well above the minimum wage, and his extra compensation comes in the form of commissions, not overtime. *Id.*; *Christopher*, 567 U.S. at 166. Because most of the salesman's work is performed away from the employer's place of business and the "quintessential outside salesmen . . . do not punch a clock," the employer often has no way of knowing how many hours an outside salesman works. *Christopher*, 567 U.S. at 158; *Jewel Tea Co*., 118 F.2d at 208. Further, the work may be difficult to standardize to any time frame and is not easily spread to other workers after 40 hours in a week, making compliance with overtime provisions difficult. *Christopher*, 567 U.S. at 166.

Congress did not expressly define "outside salesman," but it did authorize the Department of Labor to promulgate regulations defining the term and implementing other

elements of the FLSA. 29 U.S.C. § 213(a)(1). According to those regulations, "[t]he term 'employee employed in the capacity of outside salesman'" means any employee:

>  (1) Whose primary duty is (i) making sales within the meaning of section [203(k) of the FLSA[2]], or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

>  (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a)(1)–(2). Section 203(k), in turn, states that " '[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." Thus, under the general regulation, an outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition. *Christopher*, 567 U.S. at 148.

Section 541.700 of the DOL regulations defines "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The regulations further provide,

>  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* § 541.700(a). Further, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not

---

[2] Earlier versions of the regulations provided that, "sales of automobiles, coffee, shoes, cigars, stocks, bonds, and insurance are construed as sales within the meaning of section 3(k)." *See Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 754 (W.D. Mich. 2003).

the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.* 541.700(b).

Also relevant is the "promotion-work regulation," which provides that promotion work that is "performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work," whereas promotion work that is "incidental to sales made, or to be made, by someone else is not." 29 C.F.R. § 541.503(a). The promotion-work regulation does not distinguish between promotion work and sales; rather, it distinguishes between exempt promotion work that is performed incidental to an employee's own sales and nonexempt promotion work that is performed incidental to sales made by someone else. *Christopher*, 567 U.S. at 161.

Defendants contend that the outside sales exemption applies and have provided undisputed summary judgment evidence in support of the motions. Plaintiffs' Response brief includes a section titled "Plaintiffs Were Non-Exempt Employees," but it simply summarizes the applicable law and fails to cite any evidence or make any arguments about why the exemption does not apply. As Defendants note, Plaintiffs have submitted 1,951 pages of summary-judgment evidence, including six full deposition transcripts, and it is not this Court's obligation to sift through that voluminous record in support of evidence corroborating this general assertion that the exemption does not apply. *See, e.g.*, *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that

evidence supports his or her claim."); *Skotak v. Tenneco Resins, Inc*., 953 F.2d 909, 916 n. 7 (5th Cir. 1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment, especially where, as here, the nonmoving party is well aware of the existence of such evidence. Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact.").

Plaintiffs have moved for leave to file a Sur-Reply to "refine the record citations in their original response." Docket no. 83 at 2. However, the proposed Sur-Reply not contain much additional analysis of the outside sales exemption or discuss its application to the specific facts of this case beyond asserting that "Plaintiffs' productivity and scope of work were under the control, supervision and guidance of Centene Corporation and Superior HealthPlan Inc, and as such, they were not exempt from the application of overtime and minimum wage provisions under the 'Outside Sales' exemption of the FLSA." Docket no. 83-1 at 2. Plaintiffs again reference their summary-judgment evidence as a whole, without providing specific deposition citations other than a single citation concerning Defendants' record-keeping. Again, the Court will not read through six lengthy deposition transcripts to find relevant evidence, but has considered Plaintiffs' other evidence, including the various declarations, and will consider Plaintiffs' additional argument that Defendants' control and supervision of Plaintiffs renders them non-exempt.

The Court thus turns to whether the outside sales exemption applies. The relevant underlying facts in this case are undisputed, and the issue may therefore be resolved on summary judgment as a matter of law. Defendants have provided sufficient evidence that Plaintiffs'

primary duty was sales – selling Superior's Star+Plus plan to potential customers – and that sales appointments would most frequently happen at a prospect's home, though senior centers were also common, satisfying the requirement that they were customarily and regularly engaged away from their employer's place of business.

    <u>Whether Plaintiffs' primary duty was sales?</u>

    It appears undisputed that Plaintiffs' job was sales, specifically selling Medicare Advantage plans to customers. Selling insurance constitutes sales under the FLSA. *See Nunneley v. Farmers Ins. Exchange*, 564 P.2d 231, 235 (Okla. 1977) (insurance salesman was making sales within meaning of section 3(k) of the Act). Although job titles are not determinative of exempt status, 29 C.F.R. § 541.2, they are relevant, and Plaintiffs' contracts provide that they were hired as "Sales Reps" who were to "solicit enrollment." Defendants note that each Plaintiff filed a declaration stating they were "basically hired to sell Medicare Advantage Plans to customers." *See, e.g.*, Docket no. 28-1 (Ruby Martinez declaration at ¶ 2 ("I was basically hired to sell Medicare Advantage Plans to customers.")). Emails from supervisors to Plaintiffs were addressed to "Medicare Sales Team." Docket no. 81-18 at 7.

    Although these were zero-premium plans and thus enrollees did not pay premiums nor did they pay Plaintiffs or Superior, the Supreme Court noted in *Christopher v. SmithKline Beecham Corp.*, that "sale" or "sell" includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition, and "other disposition" is most reasonably interpreted as including those arrangements that are tantamount, in a particular industry, to a paradigmatic sale. 567 U.S. at 164. Further, the issue must be determined in the context of the particular industry and unique regulatory environment in which the sales persons and companies

operate. *Id.* at 161, 165. Thus, in *Christopher*, pharmaceutical sales representatives obtaining firm commitments from doctors to prescribe the particular drugs, which the patients or their insurance companies would then pay for, was held sufficient to constitute sales.

Defendants argue that Plaintiffs' work remained sales work even though Superior would be compensated by the federal government rather than Plaintiffs' solicited Medicare beneficiaries because the job was sales work regardless of who the ultimate payer would be. The Court agrees. *See Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 441-42 (S.D.N.Y. 2017) (there is no requirement that payment to outside salespeople come directly from the customer); *see also Barnick v. Wyeth*, 522 F. Supp. 2d 1257, 1264 (C.D. Calif. 2007) (although pharmaceutical sales reps focused sales efforts on doctors who do not actually buy the products, they are appropriately the target for sales efforts and appropriately considered the customers).

Nor does the fact that Superior ultimately had approval over enrollment negate the sales aspect of Plaintiff's work. In *Flood v. Just Energy Marketing Corp.*, 904 F.3d 219 (2d Cir. 2018), the Second Circuit concluded that the plaintiff was undoubtedly making sales because he was trying to persuade specific customers to sign up then-and-there for an energy plan, and he was paid only if he successfully persuaded a customer to sign. Nor was anyone else at Just Energy selling to Flood's customers or taking any kind of sales-oriented step toward completing the transaction, though some customers ultimately did not receive the product for certain reasons. "For those customers who received Just Energy products, they received them because Flood – and Flood alone – convinced them to buy Just Energy's products." 904 F.2d at 229. As the district court in *Flood* queried, "If he was not making the sale, who was? No one? This makes no sense." *Flood v. Just Energy Marketing Corp.*, No. 15-cv-2012, 2017 WL 280820, at

14

*4 (S.D.N.Y. Jan. 20, 2017). Similarly, in this case, if Plaintiffs were not making the sales, who was? Although enrollment had to be accepted by Superior, no one at Superior in that process was engaged in sales work with respect to the enrollments.

The Second Circuit cited DOL regulations making clear that employees have a primary duty of making sales if they obtain a commitment to buy from the customer and are credited with the sale. *Flood*, 904 F.2d at 229. The Court distinguished the Fifth Circuit's case in *Wirtz v. Keystone Readers Serv., Inc.*, 418 F.2d 249 (5th Cir. 1969), in which student salespersons went door-to-door and obtained initial order cards because they simply identified those receptive to the idea of purchasing magazine subscriptions, and student managers later contacted the prospects and executed the controlling order contract. To determine who is making sales, the focus is on when the sales process is complete, not whether the employer retains some after-the-fact discretion to decline to go through with a transaction to which the buyer has otherwise committed. *Flood*, 904 F.2d at 232. Thus, the Court finds that Plaintiffs' obtaining applications to enroll in Superior's plans would constitute making sales for FLSA purposes.[3]

Further, making sales was Plaintiffs' primary duty. As noted, "primary duty" means "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a).

---

[3] Defendants do not contend that Plaintiffs were "obtaining orders or contracts for services," perhaps because the general rule for outside sales employees in the regulations expressly limits those to "obtaining orders or contracts for services . . . for which a consideration will be paid by the client or customer." 29 C.F.R. § 541.500. The specific section for "making sales or obtaining orders" in § 541.501 states in subpart (a) only that section 541.500 requires that the employee be engaged in "obtaining orders or contracts for services" and omits the consideration language, but then states in subpart (b) that "[e]xempt outside sales work includes not only the sales of commodities, but also 'obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer." 29 C.F.R. § 541.501(a), (c). Thus, there is some ambiguity as to whether obtaining orders or contracts for services requires that consideration will be paid by the client or customer, or whether obtaining orders or contracts for services merely includes such orders or contracts for which a consideration will be paid by the client or customer. The Court does not reach this issue, however, because it finds that Plaintiffs were "making sales."

Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. *Id.* Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* In applying this definition, courts consider what aspects of the employee's job are of principal value to the employer. *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990).

On workdays, almost all of the work Plaintiffs performed was sales work or work incidental to and in conjunction with their own sales. A typical day involved: collecting paperwork useful for sales appointments, attending a morning meeting at the office, driving elsewhere to speak to prospective customers, meeting with customers and obtaining applications for Star+Plus plans, traveling from sales meetings to Superior's office or to other sales meetings, verifying accuracy of applications, and submitting applications to Superior. Ruby Martinez depo. at 19; David Silva depo. at 21-23; Eugene Martinez depo. at 20, 77; Mario Olivarez depo. at 73.

Defendants assert that work spent outside sales meeting still furthered Plaintiffs' sales efforts or was otherwise incidental to or in conjunction with Plaintiffs' sales or solicitations. *See* 29 C.F.R. § 541.500(b) (stating that "writing sales reports" and "planning itineraries" are included as exempt sales work); David Silva depo. at 26-28 (testifying that when he was at the office during downtime between appointments, his work entailed either following up by phone

with prospects or reviewing and submitting applications he had received that day); Eugene Martinez depo. at 44-46 (noting that much of his worktime spent outside of appointments was spent preparing for them or completing related paperwork to complete the enrollment process). Defendants contend that Plaintiffs' customer service work also furthered Plaintiffs' own sales efforts as it improved the likelihood enrollees would remain customers, citing *Lane v. Humana Marketpoint, Inc.*, No. 1:09-CV-380-MHW, 2011 WL 2181736, at *8 (D. Id. June 30, 2011).

Plaintiffs do not brief any of these issues, but provide an affidavit from Steven James Klaus, Plaintiffs' supervisor. He states that (1) agents were expected to spend considerable time either on the phone, in the office, or at home to conduct work that led to the face-to-face presentations, (2) the work each agent performed prior to face-to-face enrollment meetings constituted about 40 percent of their scheduled work activities, (3) plaintiffs also engaged in promotion work and "administrative or clerical work." However, it is clear that the outside, in - person sales appointments were the most important of Plaintiffs' duties, and that most of their day was spent attending to these appointments. Other work was primarily done to prepare for sales appointments and to complete enrollments and to promote their own sales.

The Court finds that Defendants have shown that Plaintiffs spent most of their time selling Medicare Advantage plans and engaging in work incidental to such sales, which were their own sales for which they personally received credit. Thus, their primary duty was sales.

<u>Whether Plaintiffs were customarily and regularly engaged away from their employer's place of business?</u>

To be exempt, Plaintiffs must also "customarily and regularly" perform their primary duty (making sales) away from the employer's place or places of business. 29 C.F.R. § 541.500.

"The outside sales employee is an employee who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home." 29 C.F.R. § 541.502. Outside sales does not include sales by mail, telephone, or the internet, unless such contact is merely an adjunct to personal calls, and "any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business even though the employer is not in any formal sense the owner or tenant of the property." *Id.* "Customarily and regularly" means "a frequency that must be greater than occasional but which, of course, may be less than constant" and "[t]asks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

It is undisputed that Plaintiffs spent every or virtually every weekday in sales appointments away from Superior or Centene's offices, and the majority of sales meetings took place away from Superior's offices, such as at prospects' residences or senior centers. Mario Olivarez depo. at 40-41 (70% of appointments were wherever the client was, in their home or a senior center); Eugene Martinez depo. at 13-14 (he would meet prospects at their home about 50% of the time, at another location that they felt comfortable like restaurants and libraries about 15% of the time; if they couldn't meet at their homes, they would meet at the office, which was about 35% of the time, and he would use a conference room); David Silva depo. at 12 (the lion's share of meetings were with prospects were in their homes); Ruby Martinez depo at 11-12. Defendants note that Plaintiffs also spent time driving to and from the outside appointments, and each trip was roughly 40 minutes long on average (round trip). Eugene Martinez depo. at 28; David Silva depo. at 18. Thus, Defendants argue, having even a single appointment and a

single round trip per day (and Plaintiffs regularly had more than one) would be sufficient to satisfy the location test.

Defendants contend that the outside sales work was normally and recurrently performed every workweek, as required by 29 C.F.R. § 541.701, because Plaintiffs took outside customer sales appointments and traveled to and from them, on nearly all of their workdays. Ruby Martinez depo. at 11-12; Eugene Martinez depo. at 13, 131-132; Mario Olivarez depo. at 39-40, 81-82; David Silva depo. at 12.

The Court finds that Plaintiffs customarily and regularly performed sales work away from their employer's office.

<u>Consideration of "external indicia" of outside sales employee status</u>

Courts also consider so-called "external indicia" to determine whether employees are outside sales employees. In *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 165 (2012), the Supreme Court concluded that pharmaceutical sales representatives engaged in sales and also noted that "petitioners [bore] all of the external indicia of salesmen" as "further support for that conclusion." The Supreme Court indicated that the external indicia of exempt outside salesmen were: (1) being hired for sales experience; (2) being trained to close each sale by obtaining the maximum commitment possible; (3) working away from the office, with minimal supervision, and (4) being rewarded with incentive compensation. *Id.* at 165-66.

Additional factors considered by courts have included whether the employee (1) solicits new business, (2) receives sales training, (3) was hired and denominated as a salesman, and (4) receives little or no direct or constant supervision in carrying out daily work tasks. *Barnick v. Wyeth*, 522 F. Supp. 2d 1257, 1262 (C.D. Calif. 2007); *Fields v. AOL Time Warner, Inc.*, 261

F. Supp. 2d 971 (W.D. Tenn. 2003); *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 756-58 (W.D. Mich. 2003). Although the external indicia are probative of whether employees are exempt outside sales agents, none should be controlling in isolation; the plaintiff's job as a whole must be evaluated in light of the applicable regulatory environment. *Burke v. Alta Colleges, Inc.*,  No. 11–cv–02990–WYD–KLM, 2015 WL 1399675, at *40 (D. Colo. Mar. 23, 2015) (citing *Nielsen*, 302 F. Supp. 2d at 756-57).

The Second Circuit recently noted that, although courts refer to these external indicia, the regulations that define "making sales" do not include any reference to an employee's prior sales experience, the employee's specific type of sales training, or degree of supervision. *Flood v. Just Energy Marketing Corp.*, 904 F.3d 219, 233 (2d Cir. 2018).[4] Although related regulations refer to factors such as degree of supervision (among others), these related regulations concern the analytically distinct issue of whether an employee's "primary duty" is "making sales" rather than whether the duties amount to "making sales" at all. *Id.* Thus, the Second Circuit noted that "there is good reason to doubt the weight that any unwritten 'external indicia' should be given when deciding if an employee is 'making sales' as defined under the outside salesman exemption." *Id.* at 234. Even considering the external indicia in this case, however, the Court finds that they fail to create a genuine issue of fact as to application of the outside sales exemption.

Importantly, as set forth in their contracts, Plaintiffs were paid a base salary plus commissions, with additional bonus pay for exceeding sales goals. *See also* Eugene Martinez

---

[4] "In addition, neither the FLSA nor the DOL regulations require that an employee be paid commissions in order to be exempt as an outside salesperson." *Burke*, 2015 WL 1399675, at *42 (citing *Nielsen*, 302 F. Supp. 2d at 57).

20

depo. at 38 (his compensation was based on how many people he enrolled in Superior's health plans). All courts agree that incentive compensation such as commissions and bonus pay based on sales goals is a hallmark of outside sales. *Christopher*, 567 U.S. at 166; *Nunneley v. Farmers Ins. Exchange*, 564 P.2d 231 (Okla. 1977) (insurance sales agent was employee but was exempt as outside salesman and "the fact Company paid [plaintiff] on commission basis is further indicia that he qualifies as an outside salesman").

Plaintiffs also received sales training, which courts agree is an indicia of employment as a salesman, and Plaintiffs had to be specially licensed to sell the insurance plans. *Nunneley*, 562 P.2d at 235 (fact that insurance sales agent was specifically trained for his work is a factor in support of the view that employee is outside salesman). However, Plaintiffs were assigned leads and did not independently solicit new business. This was in large part due to the regulatory environment. While this factor weighs against outside sales status, it is not determinative. *See Barnick v. Wyeth*, 522 F. Supp. 2d 1257, 1262 (C.D. Calif. 2007) ("Though the set of physicians Plaintiff contacted was at least in part pre-determined by Defendant and Plaintiff was given daily call quotas, Plaintiff was free to determine from day to day which particular physicians he contacted and when."); *Palmieri v. Nynex Long Distance Co*., No. 04-138PS, 2005 WL 767170, at *13 (D. Me. Mar. 28, 2005) (noting that "the caselaw indicates that an employer may impose some controls on the client base – such as relegation to a certain sales territory – without transforming the character of an employee as an outside salesman" and finding that employer's constraint of employee against soliciting new clients militated against a finding of outside sales, but did not countermand the weight of the remaining relevant factors).

Plaintiffs focus their argument against outside sales status on the level of control and supervision that Defendants exercised over them. As an initial matter, some degree of control must be presumed to be consistent with the exemption, as outside sales employees are employees, not independent contractors. Thus, courts generally focus on whether employees receive little or no direct or constant supervision in carrying out daily work tasks to determine outside sales status. *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 756-58 (W.D. Mich. 2003).

The evidence shows that, other than an occasional ride-along by a supervisor to ensure that Plaintiffs were complying with regulatory requirements, their sales appointments and travel were unsupervised. After a morning sales meeting, Plaintiffs drove on their own to sales appointments, and their sales appointments were conducted without supervision. Plaintiffs were limited by regulations as to what they could say in presentations, but they had discretion in how to structure their sales presentations and used their judgment to establish rapport. As a result, the length of sales appointments varied.

Plaintiffs emphasize in their affidavits that: (1) they were required to be in the office at 8 a.m. and were required to return to the office at the end of the day if the last appointment ended within business hours; (2) they did not provide their own material or literature to enrollees, as the information was strictly controlled by Defendants; (3) tight control was exercised over all training including the materials used for enrollment and specific methods of enrolling plan participants; (4) all information about enrollees was provided by Defendants; and (5) performance was regularly managed. Plaintiffs also provide an affidavit from their former supervisor Steven James Klaus, who trained and supervised them, as evidence of control. Klaus

also states that independent agents and employees essentially performed the same work and were paid under the same compensation structure, which he believed was unfair to agents.

Although Plaintiffs did have sales quotas, had to report daily to their immediate supervisors, and were otherwise subject to some control and supervision, this does not mean they were not exempt. *See Barnick v. Wyeth*, 522 F. Supp. 2d 1257, 1262 (C.D. Calif. 2007) ("Federal courts have found workers subject to daily reporting requirements and call quotas to be sufficiently unsupervised to qualify as outside salespersons."). Moreover, the Second Circuit recently held that the absence of substantial supervision by the employer is not a pre-condition to the application of the outside salesman exemption. *Flood v. Just Energy Marketing Corp.*, 904 F.3d 219 (2d Cir. 2018).

In *Flood*, the Second Circuit considered the degree of supervision of door-to-door salespersons. It noted that, on a typical work day, the plaintiff arrived at a regional office in the morning for a morning meeting that lasted about one hour and covered topics such as updates on products, awards, regulatory or market information, and sales practices. By around 12:30, a company employee used a van to transport plaintiff and his colleagues to different neighborhoods where they then dispersed to knock on doors to solicit business for the employer. The plaintiff wore a company badge and followed a company script and handed out his employer's brochure. "If the customer was convinced by [the plaintiff's] pitch, then the customer filled out a service agreement setting forth the essential terms of service" and the plaintiff then remained nearby but outside the customer's immediate presence "while the customer was required to complete a third-party verification call . . . to prevent fraud and to ensure that the customer understood what he or she was purchasing."

23

The plaintiff would then confirm the program details and would give the customer all the paperwork, which completed the sale. At the end of the day, the company van returned plaintiff and his colleagues to the regional office, where he submitted signed copies of customer agreements, which were forwarded to a corporate office for processing, where it could be rejected if the customer had poor credit or a block on changing utility accounts. The Second Circuit held that this control was insufficient to preclude application of the outside sales exemption, noting that while plaintiff invoked the absence of direct supervision as being within the purported "spirit and purpose" of the exemption, the court must focus on what the law says, and absence of supervision and control is not a requirement. *Id.* at 234-35.

As in this case, the plaintiffs' "argument reduces to an argument about just one of the many external indicia factors: *supervision* – that [Defendants] engaged in too much supervision for [plaintiffs] to be deemed an outside salesman." *Flood*, 904 F.3d at 234. The Second Circuit held that, "[i]n the absence of words in the statute or regulation that require consideration of the degree of supervision when deciding if an employee is 'making sales,' we decline to add a 'subject to supervision' exception to the 'making sales' requirement of the outside salesman exemption under the FLSA." *Id.* at 235. Further, the Second Circuit could not conclude that the high degree of supervision, standing alone, could create a genuine issue of fact as to whether Flood was making sales. *Id.*

The Court recognizes that *Flood* is contrary to a recent district court opinion with virtually the same facts and the same defendant (or its privy) and the same types of door-to-door sales – *Hurt v. Commerce Energy, Inc.*, 92 F. Supp. 3d 683 (N.D. Ohio 2015). The Second Circuit expressly disagreed with *Hurt*. In *Hurt*, the district court denied a post-trial motion for

judgment as a matter of law, noting that "[w]hen considering whether Plaintiffs bore the 'external indicia' of outside salespeople—a list of non-exhaustive factors that the jury could consider as part of the totality of the circumstances—the evidence could easily support the jury's verdict." *Id.* The district court found that there was thus sufficient evidence for the jury to have found either way on the outside sales exemption based on the external indicia. *Id.*

The Court agrees with the Second Circuit that, whatever the "spirit and purpose" of the outside sales exemption, nothing in the regulations requires an absence of overall control and supervision for the exemption to apply. The underlying facts in this case are undisputed and, as in *Flood*, Plaintiffs' opposition to application of the exemption relies solely on the element of control. The Court finds that no material fact issues exist to preclude summary judgment. The evidence conclusively shows that Plaintiffs were employed for the purpose of and were customarily and regularly engaged away from their employer's places of business in making sales within the meaning of the FLSA. They regularly and customarily met for face-to-face sales presentations with potential enrollees, primarily at the enrollees' homes, and they obtained commitments as far as possible under the regulatory framework in the form of enrollment applications. Plaintiffs were also credited with their own sales and were paid with incentive compensation based on their own sales. They engaged in other work primarily incidental to and to further their own sales. As such, sales was their primary duty, and they customarily and regularly engaged in exempt sales activity away from Defendants' offices. Accordingly, the Court finds that Plaintiffs were exempt outside sales agents as a matter of law. The Court therefore grants summary judgment in favor of Defendants on this issue.

**Superior's Counterclaims for Money Had and Received**

Superior filed counterclaims against Eugene Martinez and David Silva for money had and received. Docket no. 38. They contend that both received payouts twice on commissions due to a mistake, with Silva receiving a $2,250 overpayment and Martinez receiving an $8,000 overpayment. Superior asserts that it has requested a return of the overpayments, but Silva and Martinez have not repaid the duplicate commissions. The Court denied Plaintiffs' motion to dismiss the counterclaims in docket no. 49, noting that the pleading sets forth a claim for money had and received or unjust enrichment sufficient to comply with *Twombly*. The counterclaims remain pending.

**Suggestion of Death of Sylvia Trevino**

Plaintiff' counsel filed a Suggestion of Death for Sylvia Trevino pursuant to Rule 25 on January 22, 2018. Rule 25 provides:

> Substitution if the Claim Is Not Extinguished. If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Fed. R. Civ. P. 25(a)(1). Under Rule 25(a)(3), a statement noting death must be served on the parties under Rule 5 and on non-parties as provided in Rule 4. Fed. R. Civ. P. 25(a)(3). Personal representatives of a  deceased plaintiff's estate are non-parties that must be personally served in accordance with Rule 4, and thus a suggestion of death filed by a plaintiff's attorney but not served on the employee's estate does not start the 90-day clock. *Sampson v. ASC Industries*, 780 F.3d 679 (5th Cir. 2015). Service on the estate's attorney is insufficient, nor is it sufficient that the executor has actual notice. *Id.*

The Suggestion of Death should have been served on the representative to be substituted, but it was noted that counsel had not identified a representative at the time. Plaintiff's counsel stated he would exercise diligence in identifying the representative, and would serve them in accordance with Rule 4 for the purpose of substituting parties. However, there is no indication that Trevino's representative has been identified or served. The parties shall therefore provide briefing concerning the proper disposition of Sylvia Trevino's claims.

**Conclusion**

Plaintiffs' Motion to file Sur-Reply (docket no. 83) is GRANTED.

Defendants Centene and Superior's Motions for Summary Judgment (docket no. 72 & 73) are GRANTED IN PART.  Defendants are granted summary judgment on the application of the outside sales employee exemption. The Court does not decide any other issue raised in the motions for summary judgment, including whether Plaintiffs were employees or independent contractors, whether Centene was a joint employer, whether Defendants engaged in record-keeping violations, and whether certain Plaintiffs' claims are barred by limitations.

Superior's counterclaims for money had and received against Eugene Martinez and David Silva remain pending. The parties shall confer and determine whether trial is necessary on the counterclaims.  The parties shall provide briefing as to the proper disposition of Sylvia Trevino's claims no later than  **March 14, 2019**.

SIGNED this 5th day of March, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE